UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINCENT ROBERT MACKEY, <br><br> Plaintiff, <br><br> v. <br><br> RAMIREZ BATILE, et al., <br><br> Defendants. | Case No. 22-cv-05016-JSC <br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION FOR SANCTIONS** <br><br> Re: Dkt. Nos. 26, 39 |

## INTRODUCTION

Plaintiff, a California prisoner proceeding without attorney representation, filed this civil rights complaint under 42 U.S.C. § 1983 against doctors and administrators at San Quentin for failing to provide him adequate medical care.[1] Defendants filed a motion for summary judgment (ECF No. 26)[2], Plaintiff filed an opposition (ECF No. 30), and Defendants filed a reply brief (ECF No. 32). Plaintiff filed a further reply (ECF No. 33) and later a 2-page document entitled "Additional Support Opposing Defendants' Summary Judgment Motion" (ECF No. 41); these two documents are construed as sur-replies, and, in light of Plaintiff's lack of attorney representation and incarceration, Plaintiff is granted leave to file them.[3] For the reasons discussed below, the motion for summary judgment is GRANTED, and Plaintiff's motion for sanctions (ECF No. 39) is DENIED.

//

//

---

[1] Plaintiff was transferred to the California Substance Abuse and Training Facility ("CSATF") on October 18, 2022, approximately one month after he filed this case. (ECF No. 26-1 at 35 ("arrived SATF on 10/18/22").)

[2] Defendant Dr. Wu joined in the motion after it was filed. (ECF No. 31.)

[3] For the same reasons, Plaintiff's failure to get prior approval to file these items, as required by Civil Local Rule 7-3(d), is excused.

## BACKGROUND

Plaintiff attests in the verified complaint[4] he suffers from "full 'peristalsis failure' in the lower bowel." (ECF No. 1 at 2.) He has "persistently complained" about this problem to "rotating doctors," but "every doctor to date ([Defendants] Dr. Wu, Dr. Cook, Dr. Ramirez [Batile]) and Health Care Appeal responders ([Defendants T. Woodson, Nurse Podolsky, S. Gates, M. Verdier) 'dismiss,' often with snide and derisive commentary, the possibility of 'peristalsis failure.'" (*Id.*) Plaintiff attests, "It's in every encounter (Dr. visits, Nurse visits or Healthcare grievance submissions) [diagnosed] as constipation or irritable bowel syndrome." (*Id.* at 3.) He has experienced "a recurring cycle" of "multiple doctor visits, multiple nurse visits, which lead to a G.I [gastroenterologist] specialist visit, with constipation and or irritable bowel syndrome diagnosis, with varying forms of laxatives and suppositories being prescribed, which do not work." (*Id.*) "[O]ver the years" he has had to "evacuate [his] bowels" by "drink[ing] . . . Lactulose (liquefies fecal matter in colon) and insert[ing] a suppository anally, every couple of days," then later getting into a variety of positions, and "insert[ing his] fingers inside [his] rectum." (*Id.*) If he does not "do these things, the entire tract becomes clogged to the stomach, which leads (every time) to violently throwing up." (*Id.*) He experiences "nausea, back pain, Bloating, Distention, Gas is completely trapped." (*Id.*) He further attests he "cannot have a cell-mate and they give me write-ups (punishment) for refusing to take one." (*Id.*) Plaintiff wants "Drs to order test[s] that determine if 'there is' or is not 'peristalsis failure,' e.g. barium x-ray, rectal biopsy, etc." (*Id.*) He asserts, "I know[s] 'absolutely' I have 'peristalsis failure'" but "test[s] are needed so 'they know.'" (*Id.*)

Defendant Dr. Cook testifies in his declaration he has treated Plaintiff at San Quentin, and Plaintiff has "chronic constipation." (ECF No. 26-1 at 2:1.) He attests "there is a condition similar" to Plaintiff's assertion of "peristalsis failure" "called "paralytic ileus," in which "the

---

[4] A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995). Plaintiff's opposition is not verified (*see* ECF No. 30 at 25), so while the medical records submitted as exhibits to the opposition are evidence, the opposition itself is not. Plaintiff's sur-replies are also not evidence because they are also not verified (ECF Nos. 33 at 8; 41 at 2.)

intestine fails to transmit peristaltic waves, resulting in a functional obstruction, and allowing fluid and gas to collect in the intestine." (*Id.* at 2:6-7.) According to Dr. Cook, this condition is "most common after surgery," it "generally goes away on its own after a few days," and Plaintiff's "symptoms are inconsistent" with it insofar as Plaintiff "claims he has been suffering from peristalsis failure for years." (*Id.* at 2:8-11.) Dr. Cook further testifies that he is "unaware of any disease or illness consistent with [Plaintiff's] allegations of long-term, chronic peristalsis failure." (*Id.* at 2:12-13.) He opines Plaintiff's frequent "sensation of incomplete evacuation," "sensation of anorectal obstruction/blockage," and "manual maneuvers . . . (e.g. digital evacuation, support of the pelvic floor)" are "most consistent with a diagnosis of functional constipation." (*Id.* at 2:16-20.)

Dr. Cook explains California Department of Corrections and Rehabilitation ("CDCR") "physicians are generalists who treat a wide variety of common ailments. When a patient has an unusual condition or a condition that does not respond to ordinary treatments, a CDCR physician will typically refer the patient to an outside (i.e., non-CDCR employee) specialist." (*Id.* at 3:8-11.)

In May of 2021, Plaintiff underwent a colonoscopy, and "the findings of the colonoscopy were normal. Specifically, the performing physician wrote 'Normal colon. NO polyps or mass lesions. NO narrowing or angulation or stricture." (*Id.* at 3:13-15, 9.[5]) Plaintiff "underwent an anorectal motility study in December of 2021. The results were normal (although it found high normal mean sphincter pressure, with a recommendation to consider using nitroglycerin ointment)." (*Id.* at 3:18-20, 20.)

Dr. Cook discussed these results with Plaintiff at an appointment on February 28, 2022, and when Dr. Cook "suggested that Plaintiff should consider seeing another gastroenterologist, Plaintiff said 'I have seen 8 of them, and no one listens to me.'" (*Id.* at 3:20-22, 21.) Dr. Cook ordered enemas, suppositories, lab work, a referral to a gastroenterologist, and nitroglycerin

---

[5] The exhibits to Dr. Cook's declarations are Plaintiff's medical records, but the Court cites to ECF page numbers for ease of reference. Exhibit A lists Defendant Dr. Ramirez Batlle under "sign information" (a term that is not explained by the parties) and includes Dr. Ramirez Batlle's electronic signature. (ECF No. 26-1 at 7). This is the only mention of Dr. Ramirez Batlle the Court has found in the medical records produced by the parties; the Court finds no mention of Defendant Dr. Wu in these records.

cream.  (*Id.* at 19.)

At another appointment with Dr. Cook on March 14, 2022, Plaintiff indicated he had "used many different types of laxatives" that "don't help," and "lactulose occasionally [] makes his stools more liquid-y but [Plaintiff] doesn't like drinking the syrup." (*Id.* at 3:25-4:2, 26.)  Plaintiff also indicated he "had [gastroenterologist] visits for this issue." (*Id.* at 4:2, 27.)  Plaintiff "requested a diagnosis of peristalsis failure," but Dr. Cook opined, "we do not as of yet have a clear diagnosis for his symptoms but peristalsis failure seems unlikely as the rest of his bowels are moving stool, they just 'get stuck' at the level of the rectum from what he describes." (*Id.* 4:3-5, 27.)  Dr. Cook "ordered that [Plaintiff] receive enema kits, nitroglycerin suppositories (used to treat anal fissures), nitroglycerin cream, lab work, and a referral to a gastroenterologist." (*Id.* at 4:6-8, 28.)  In an addendum, Dr. Cook noted the enema kits "were not available and had "to be ordered individually," so he determined "will trial nitroglycerine cream for potential HTN and also give glycerine suppositories prn for now." (*Id.* at 25.)

Dr. Cook saw Plaintiff again on May 16, 2022, and Plaintiff "reported refusing the gastrointestinal appointment that [Dr. Cook] had ordered" because the "car ride would have made him carsick and 'he has seen GI many times and he does not want to keep seeing any more GI doctors unless they are a specialist in peristalsis failure and they will believe that he has this problem.'" (*Id.* at 4:11-14, 31.)  Plaintiff requested a single-cell "due to his constipation." (*Id.* at 4:10-11, 30.)  Dr. Cook informed Plaintiff "that all gastroenterologists are specialists," but Plaintiff "nevertheless continued indicating no desire to see a gastroenterologist." (*Id.* 4:15-16.)  Dr. Cook "counseled [Plaintiff] that if he changed his mind, he could request to see" a gastroenterologist.  (*Id.* at 4:16-17, 32.)

On October 27, 2022, Plaintiff had an appointment with Dr. Ndu (who is not a Defendant) at the California Substance Abuse and Training Facility (CSATF).  (*Id.* at 4:19, 35.)  Dr. Ndu found Plaintiff has "chronic idiopathic constipation and long history of opioid use, currently on suboxone, which may be contributory." (*Id.* at 36.)  He noted Plaintiff had seen a gastroenterologist "earlier that month" (*see* ECF No. 30-3 at 16) (as discussed below), and Plaintiff "thinks he has peristalsis failure, although not diagnosed by [gastroenterologist]." (ECF

4

No. 26-1 at 36.) Plaintiff reported taking the laxatives "linzess" and "senna" but not "lactulose," so Dr. Ndu ordered "miralax 17g daily" (another laxative) and a "fiber tablet daily" and "counseled" Plaintiff on "medication compliance." (*Id.*) In addition, Dr. Ndu's progress notes indicate a "'UM RN [utilization management nurse] reached out to UCSF [University of San Francisco] [sic] to schedule GI appointment but was told that they don't see prisoners. UM would try to schedule appointment with another tertiary institution [university].'" (*Id.* at 4:20-25, 36.)

Dr. Cook testifies his review of Plaintiff's medical records and his personal experience with Plaintiff[6] indicate Plaintiff "has seen many physicians, including gastroenterologists, about his constipation. He has undergone several diagnostic tests, including a colonoscopy and anal manometry, which tests the pressure applied by the anus and rectum. And he has been provided with several types of laxatives." (*Id.* at 4:26-5:3.) Dr. Cook opines "there is nothing more that I, or another CDCR physician, could do for [Plaintiff], other than continue to refer him to gastroenterologist specialists and provide him with laxatives." (*Id.* at 5:3-5.)

Plaintiff has also submitted medical records of the care he received for his gastrointestinal condition from January to November 2022.[7] (*See* ECF No. 30-2 at 13-30; 30-3 at 1-5, 8-20; 30-4 at 34-39; 30-5 at 1-8.) These include the records of the appointments with Dr. Cook and Dr. Ndu, discussed above, as well as appointments with other non-defendant general practitioners at San Quentin and CSATF and a gastroenterologist at Highland Hospital regarding his gastrointestinal condition. (*Id.*) The records show Plaintiff complaining about the same symptoms and receiving similar treatment as described in Dr. Cook's declaration and exhibits, including laxatives, offers of referral to gastroenterologists, a "stool assessment," an x-ray, and counseling on diet and fluid intake. (ECF Nos. 30-2 at 13-14 (research into "Sitz x-ray"), 20 ("utilized diagram to educate on nutrient absorption and why LNS liquid diet is inferior to a balanced diet with adequate fluid intake"), 21 (listing "docusate-senna, lactulose, polyethylene glycol" among "ordered"

---

[6] Plaintiff also saw Dr. Cook on July 18, 2022, and Dr. Cook again offered, and Plaintiff declined, a referral to a gastroenterologist. (ECF No. 30-5 at 5-6.)
[7] These exhibits also include medical records regarding other unrelated medical conditions, such as eye care and mental health care, as well as articles about gastrointestinal conditions; the records are out of order, not clearly labeled, and in many cases marked with Plaintiff's handwriting.

1   medications); 30-3 at 1 (ordering "XR abdomen"); 30-4 at 38 ("he has refused GI [follow-up]);
2   30-5 at 1 (referral for "tertiary care level [gastroenterological] evaluation"), 5 (Plaintiff "continues
3   not to want to speak to gastroenterologists").)

4       Plaintiff also submits the records of an October 7, 2022, examination by a
5   gastroenterologist, Dr. McCabe, at Highland Hospital (who is also not a defendant).[8] (ECF No.
6   30-3 at 12-19.) Dr. McCabe states Plaintiff has "[l]ikely idiopathic constipation, unclear at this
7   [time] whether it can be classified as slow transit vs. pelvic floor dysfunction." (ECF No. 30-3 at
8   13.) Dr. McCabe further informed Plaintiff, "[W]e believe you have a neuromotor peristalsis
9   problem of the large intestine that needs further diagnostic testing." (*Id.* at 16.) He referred
10  Plaintiff to the California Pacific Medical Center to repeat the anorectal manometry test and do
11  additional tests, ordered a "Sitz X-Ray," recommended enemas, a liquid diet, and a single cell.
12  (*Id.*) He also stated, "For medications, you can try Linzess" and the "prescribing physician in
13  prison can also consider ordering Motegrity, which may help peristalsis. I cannot predict the
14  insurance coverage for it." (*Id.*)[9]

15      Plaintiff has submitted with his opposition copies of administrative grievances
16  complaining about the medical care he received for his gastrointestinal condition between 2020
17  and 2022.[10] (ECF Nos. 30-1 at 1-56, 30-2 at 6-8, 30-3 at 6.) These include grievances decided by
18  Defendants Woodson, Podolsky, Verdier, and Gates. (*See* ECF No. 30-1 at 3-7, 15-21, 35-45, 51-
19  52; ECF No. 30-2 at 6-10; 30-3 at 6).

20                **DISCUSSION**

21  I.    Standard of Review

22      Summary judgment is proper where the pleadings, discovery and affidavits show there is
23  "no genuine issue as to any material fact and that the moving party is entitled to judgment as a
24  matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of

---

[8] The record does not explain why Plaintiff agreed to see this gastroenterologist after repeatedly refusing to see gastroenterologists previously.
[9] It appears the appointment with Dr. Ndu at CSATF discussed above was a follow-up to this visit.
[10] Like the medical records, the copies of the administrative appeals were not submitted in a coherent or chronological order and are not clearly labeled.

1 the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,248 (1986). A dispute as to a material
2 fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the
3 nonmoving party. *Id.*

4     The party moving for summary judgment bears the initial burden of identifying those
5 portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine
6 issue of material fact. *Celotex Corp.v. Cattrett*, 477 U.S. 317, 323 (1986). When the moving
7 party has met this burden of production, the nonmoving party must go beyond the pleadings and,
8 by its own affidavits or discovery, set forth specific facts showing there is a genuine issue for trial.
9 *Id.* If the nonmoving party fails to produce enough evidence to show a genuine issue of material
10 fact, the moving party wins. *Id.*

11     At summary judgment, the judge must view the evidence in the light most favorable to the
12 nonmoving party. *Tolan v. Cotton*, 570 U.S. 650, 656-57 (2014). If more than one reasonable
13 inference can be drawn from undisputed facts, the trial court must credit the inference in favor of
14 the nonmoving party. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

15 II.    <u>Analysis</u>

16     1.    <u>Plaintiff's Claim</u>

17     In reviewing the complaint under 28 U.S.C. § 1915A, the Court concluded Plaintiff stated
18 a claim against Defendants Dr. Cook, Dr. Batlle, and Dr. Wu, and against prison officials who
19 reviewed his administrative grievances about his medical care, N. Podolski, M. Verdier, T.
20 Woodson, and S. Gates, for violating his Eighth Amendment rights by being deliberately
21 indifferent to his serious medical needs. The Court also concluded the allegations of Plaintiff's
22 persistent inadequate care were sufficient to state claims against two supervisor defendants ---
23 Warden Broomfield and Chief Medical Officer Pachynski --- on theories of inadequate training
24 and/or supervision, and/or for creating policies that caused Plaintiff to receive inadequate medical
25 treatment. Plaintiff seeks injunctive relief in the form of tests for "peristalsis failure," an "official
26 apology . . . on record, with reprimand," to have "doctor visits audio recorded," and "to do all that
27 can be done to fix or mitigate" his condition. (ECF No. 1 at 3.) Plaintiff also seeks two million
28 dollars in damages. (*Id.*)

7

1  2. Eighth Amendment Standard

  Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on such a claim, a prisoner-plaintiff must show a "serious medical need," and that the defendants' "response to the need was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

  Defendants do not argue Plaintiff's condition is not "serious" within the meaning of the Eighth Amendment, only that there is no triable issue that they were deliberately indifferent to his needs. A prison official is deliberately indifferent if the "official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). An official is liable if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. So, for deliberate indifference to be established, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *See Simmons v. G. Arnett*, 47 F.4th 927, 933 (9th Cir. 2022). "Under this standard, an inadvertent failure to provide adequate medical care, differences of opinion in medical treatment, and harmless delays in treatment are not enough to sustain an Eighth Amendment claim." *Id.* Neither is a claim of medical malpractice or negligence. *See Toguchi v. Chung,* 391 F.3d 1051, 1060 (9th Cir. 2004)."A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a "mere difference of medical opinion" among medical professionals as to the need to pursue one course of treatment over another does not raise a "material question of fact" regarding the issue of deliberate indifference. *Toguchi*, 391 F.3d at 1058; *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances, and was chosen in conscious disregard of an excessive risk to [the prisoner's] health." *Toguchi*, 391 F.3d at 1058

1 (citation and internal quotations omitted).

2     3. <u>Analysis</u>

3         a. <u>Doctor Defendants</u>

4             i.     <u>Dr. Cook</u>

The evidence, even when viewed in a light most favorable to Plaintiff, does not allow a rational fact-finder to conclude Dr. Cook knew Plaintiff faced "a substantial risk of serious harm" and "disregard[ed] that risk by failing to take reasonable measures to abate it." *See Farmer*, 511 U.S. at 847.

There is no evidence Dr. Cook's evaluation and treatment of Plaintiff's condition was medically unacceptable. Dr. Cook's opinion that Plaintiff suffered from "chronic constipation" was confirmed by other doctors who treated Plaintiff after Dr. Cook, that is, Dr. Ndu at the CSATF and the gastroenterologist, Dr. McCabe. (ECF Nos. 26-1 at 36 (describing Plaintiff as suffering from "chronic idiopathic constipation"); 30-3 at 13 (same).) Plaintiff's personal disagreement with that diagnosis does not create a genuine issue of material fact as to whether Dr. Cook was deliberately indifferent in making it. *See Franklin*, 662 F.2d at 1344. That the gastroenterologist indicated he "believe[d]" Plaintiff had "a neuromotor peristalsis problem" (ECF No. 30-3 at 16) when he examined Plaintiff several months after Dr. Cook also does not support an inference Dr. Cook was deliberately indifferent with his diagnosis. Dr. McCabe did not disagree with Dr. Cook insofar as he stated *both* that Plaintiff suffered from "idiopathic chronic constipation" (ECF No. 30-3 at 13) *and* had a peristalsis problem (*id*. at 16), suggesting the two conditions can be synchronous. Moreover, there is no evidence Dr. Cook knew Plaintiff had a problem different from idiopathic chronic constipation and disregarded it, as is required to show deliberate indifference. *See Farmer*, 511 U.S. at 847. To the contrary, Dr. Cook, who is a general practitioner without expertise in gastroenterology, testified he was "unaware of any disease or illness consistent with [Plaintiff's] allegations of long-term, chronic peristalsis failure." (ECF No. 26-1 at 2:12-13.) Given his limited expertise on the subject, Dr. Cook reasonably addressed the issue by repeatedly referring Plaintiff to a gastroenterologist (*see*, *e.g.*, *id.* at 19, 28, 32; ECF No. 30-5 at 5-6) and, when Plaintiff refused, "counseled [Plaintiff] that if he changed his mind, he

1  could" always return and "request to see" one (ECF No. 26-1 at 4:16-17).

2  There is also no evidence Dr. Cook's course of treatment "was medically unacceptable under the circumstances." *See Toguchi*, 391 F.3d at 1058. The medical records show Dr. Cook examined Plaintiff four times over the course of several months (between February and July 2022), each time providing a range of treatments including laxatives, suppositories, and nitroglycerine cream, ordering lab work, and referring Plaintiff to a gastroenterologist. (See, *e.g.*, ECF Nos. 26-1 at 3:20-22, 4:6-8, 4:16-17, 19, 21, 23, 28, 32; 30-5 at 5-6.)[11] Again, Plaintiff's personal disagreement with Dr. Cook's treatment choices is, as a matter of law, insufficient to allow a reasonable inference those choices were medically unacceptable. *See Franklin*, 662 F.2d at 1344. There is also no evidence of any medical professional determining Dr. Cook's choices were medically unsound. To the contrary, evidence regarding the other doctors who treated Plaintiff show they provided similar treatment as Dr. Cook, including laxatives, suppositories, nitroglycerine cream, and referrals to a gastroenterologist. (ECF Nos. 30-2 at 13-14, 20-21; 30-3 at 1; 30-4 at 38; 30-5 at 1, 5). Similarly, that the gastroenterologist Dr. McCabe later ordered additional testing, medication, and a liquid diet (ECF No. 30-3 at 16) does not support a reasonable inference that Dr. Cook—given his lesser expertise in gastroenterology—knowingly disregarded Plaintiff's medical needs. Rather, such evidence only demonstrates the reasonableness of Dr. Cook's repeatedly referring Plaintiff to a gastroenterologist to receive better medical care for his gastrointestinal condition.

Plaintiff complains Dr. Cook did not provide him with enemas (ECF No. 30 at 5-6, 8), which was one of the recommendations of the gastroenterologist Dr. McCabe (ECF No. 30-3 at 16). But Dr. Cook did order enemas for Plaintiff twice (*id.* at 4:3-8, 19, 27-28), but when he learned they were not readily in supply, he decided Plaintiff could try just using the laxatives and glycerine suppositories (*id.* at 28). The evidence does not support a reasonable inference Dr. Cook's decision to hold off on the enemas was made in "conscious disregard" to a risk to Plaintiff's safety. *See Toguchi*, 391 F.3d 1058. Again, Dr. Cook did not have gastroenterological

---

[11] These medical records are uncontradicted by any evidence offered by Plaintiff.

1  expertise, and he saw Plaintiff before Dr. McCabe did, so at the time he made his treatment

2  decision he did not have the benefit of that recommendation.

3        Plaintiff also complains he should have been referred to a "motility" gastroenterologist

4  rather than a "general" gastroenterologist.  (ECF No. 30 at 4 ("the [gastroenterologists] I was

5  being sent to were not the type I need (motility specifically[])"), 22.)  There is no evidence there

6  are such sub-specialty gastroenterologists, but even assuming they exist, the Court is aware of no

7  authority, and Plaintiff cites none, providing a general practitioner was unreasonable, let alone

8  deliberately indifferent, in failing to refer a patient directly to a sub-specialist.  So, a reasonable

9  fact-finder would have to conclude Dr. Cook's decision to refer Plaintiff to a gastroenterologist,

10  who could then determine whether further referral to any sub-specialist, was medically acceptable

11  under the circumstances.

12        Plaintiff's speculation that he has "Hirchsprung's Disease" (*see* ECF Nos. 30 at 4 ; 30-4 at

13  1-4) is not supported by any evidence that any medical professional has made that diagnosis.

14  Plaintiff's own opinion is not enough to create a material question of fact as to whether Dr. Cook's

15  different diagnosis amounted to deliberate indifference.  *See Franklin*, 662 F.2d at 1344.

16        In sum, there is no evidence upon which a reasonable trier of fact could find Dr. Cook's

17  repeated and ample efforts to treat Plaintiff's condition was medically unacceptable, let alone find

18  Dr. Cook consciously disregarded an excessive risk to Plaintiff's health.  As a result, there is no

19  triable issue as to whether Dr. Cook was deliberately indifferent to Plaintiff's serious medical

20  needs in violation of the Eighth Amendment.

21        ii.   <u>Dr. Wu and Dr. Ramirez Batlle</u>

22        Plaintiff has submitted no evidence regarding the treatment of San Quentin doctors Dr. Wu

23  or Dr. Ramirez Batlle.  Apart from a single mention of Dr. Batlle as signing the results of

24  Plaintiff's colonoscopy in May 2021 (ECF No. 26-1 at 7), there are no medical records showing

25  when or how these Defendants provided medical care to Plaintiff.  The only other evidence

26  regarding them are Plaintiff's statement in the verified complaint that, like Dr. Cook, these

27  Defendants "dismiss[ed] . . . the possibility of 'peristalsis failure'" and "in every encounter"

28

1    diagnosed him with "constipation or irritable bowel syndrome."[12]  (ECF No. 1 at 2-3.)  The

2    complaint also appears to include them (along with Dr. Cook) among the "doctor visits" that "lead

3    to a G.I [gastroenterologist] specialist visit with constipation and or irritable bowel diagnosis, with

4    varying forms of laxatives and suppositories being prescribed, which do not work."  (*Id.* at 3.)

5          Plaintiff's assertion that Defendants Dr. Ramirez Batlle and Dr. Wu dismissed his

6    complaints is inadmissible hearsay.  *See* Fed. R. Evid. 801(c) (hearsay is a statement "other than

7    one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the

8    truth of the matter asserted").  In any event, like Dr. Cook, these Defendants were general

9    practitioners and, for the reasons discussed above, their diagnosis of constipation and irritable

10   bowel syndrome does not support a reasonable inference of deliberate indifference because there

11   is no evidence that such a diagnosis was "medically unacceptable under the circumstances" or

12   done with a "conscious disregard" to a risk of harm to Plaintiff.  *Toguchi*, 391 at 1058.  Indeed, the

13   complaint asserts the gastroenterologists made a similar diagnosis (ECF No. 1 at 3 ("G.I specialist

14   visit with constipation and or irritable bowel diagnosis"), as did the gastroenterologist Dr. McCabe

15   in November 2022 (ECF No. 30-3 at 13 ("likely chronic idiopathic constipation").)  Furthermore,

16   for the reasons discussed above, no reasonable inference can be drawn that giving laxatives and

17   suppositories and multiple referrals to gastroenterologists, were medically unacceptable treatments

18   for constipation.[13]  Even if this treatment did not work, as Plaintiff asserts, no reasonable inference

19   can be drawn these Defendants, as general practitioners, knew of and disregarded treatments that

20   would work better to abate the risk of harm from Plaintiff's condition.  Consequently, there are no

21   triable issues of fact as to whether Dr. Wu and Dr. Ramirez Batlle were deliberately indifferent to

22   Plaintiff's medical needs in violation of the Eighth Amendment.

23       //

---

[12] Plaintiff submits a grievance alleging Dr. Ramirez Batlle "dismiss[ed]" his complaints that his "evacuation process (peristalsis) does not function."  (ECF No. 20-1 at 33.)  This allegation cannot be considered as evidence because it not a sworn statement by Plaintiff.  It is also duplicative of the same assertion in the complaint, which *is* verified, addressed above.

[13] To whatever extent the mention and signature of Dr. Ramirez Batlle on the colonoscopy report indicates he or she ordered it, there is no evidence supporting an inference that doing so was medically unacceptable.

12

b. Administrator Defendants

There also is no triable issue of fact that the officials who denied his grievances, Defendants N. Podolski, M. Verdier, T. Woodson, and S. Gates, were deliberately indifferent to his serious medical needs. The basis of the claims against these Defendants is that Plaintiff informed them that he was receiving inadequate medical care from his doctors, and these Defendants violated his Eighth Amendment rights by denying his requests for improved care.

As discussed above, to be deliberately indifferent under the Eighth Amendment, a prison "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. In *Peralta v. Diller*, 744 F.3d 1076 (9th Cir. 2006), the Ninth Circuit held that an official—the prison's Chief Medical Officer—who denied a prisoner's inmate grievance regarding dental care was not deliberately indifferent to the prisoner's dental needs because the official "relied on the medical opinions of the staff dentists who had investigated [the prisoner's] complaints and already signed off on the treatment plan." *Id.* at 1086. The court noted the official, who was not a dentist, had a role that was "largely administrative, . . . not second-guessing staff dentists' medical judgments. And how could he have? Even if he had looked at [plaintiff's] chart, he wouldn't have been able to tell whether [plaintiff's] had a serious medical need and what the best course of treatment was." *Id.* (citing *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) (finding non-medical professionals were not deliberately indifferent in denying grievance seeking hernia surgery despite prisoner's pain where treating surgeon determined surgery not required) (citing cases), and *Meloy v. Bachmeier*, 302 F.3d 845, 848 (8th Cir. 2002) (granting qualified immunity to nurse, who was acting as administrator, because her "adherence to [doctor's] order" was "objectively reasonable in light of the legal rules in place at the time"). The court concluded the plaintiff had not "shown that [the defendant] should have been aware of any risk to [the plaintiff's] health, let alone that [the defendant] actually was aware." *Peralta*, 744 F.3d at 1086.

Here, Defendants N. Podolski, M. Verdier, T. Woodson, and S. Gates, like the administrator in *Peralta*, did not have the medical expertise to be able to know whether Plaintiff had "peristalsis failure," or to determine "the best course of treatment" for Plaintiff's condition, or

13

to otherwise "second-guess[]" the treatment that the doctors were providing.[14] *See id.* They were aware of Plaintiff's symptoms, investigated the situation, made sure Plaintiff was receiving medical care, and reasonably relied on the medical opinions of the doctors, including that they referred him to gastroenterologists who had area expertise. (*See* ECF No. 30-1 at 3-5, 17-19, 41-43, 45, 51-52; ECF No. 30-2 at 8-10; 30-3 at 6). *Cf. Johnson*, 433 F.3d at 1010-11 (finding grievance counselor, who "investigated the situation, made sure the medical staff was monitoring and addressing the problem, and reasonably deferred to the medical professionals' opinions" that surgery was not medically necessary, was "insulated from liability" on Plaintiff's Eighth Amendment claim). Moreover, as discussed above, while there is evidence Plaintiff's symptoms continued, there is no evidence there was a more effective treatment plan than what Plaintiff was receiving. As a result, there is no evidence these defendants "should have been aware of any risk" to Plaintiff's health, let alone that they "actually w[ere] aware" of such a risk, and disregarded it in denying his grievances. *Peralta*, 744 F.3d at 1086.

Accordingly, there is no triable issue of fact that Defendants N. Podolski, M. Verdier, T. Woodson, and S. Gates were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment.

        c. <u>Supervisor Defendants</u>

Lastly, Plaintiff sues two San Quentin supervisory officials, Warden Broomfield and Chief Medical Officer Pachynski. A supervisor may be liable under section 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Henry A. v. Willden*, 678 F.3d 991, 1003-04 (9th Cir. 2012). The latter showing may be based upon evidence of a supervisor's "own culpable action or inaction in the training, supervision, or control of [their]

---

[14] Only Podolski appears to be a medical professional, a nurse, but there is no evidence that he/she she had expertise in gastroenterology or the background to second-guess treating general practitioners and gastroenterologists. In *Peralta*, the defendant was a doctor, but that did not change the analysis because he did not have expertise about the dental grievance. 744 F.3d at 1086. Thus, no reasonable inference can be drawn from the mere fact of Podolski being a nurse that he/she should have known or did know the treatment Plaintiff was receiving was medically inappropriate.

14

1  subordinates." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011). Or their liability may be based
2  upon evidence that a supervisor implemented "policy so deficient that the policy itself is a
3  repudiation of constitutional rights and is the moving force of the constitutional violation."
4  *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).

There is no evidence these Defendants were personally involved in treating Plaintiff, or that they were aware of any of the issues Plaintiff was having with his gastrointestinal condition. There is similarly no evidence of any medical care policies implemented by them, or of the training or supervision of the other Defendants by them or other San Quentin officials. In short, there is no evidence of any conduct by them, whatsoever, let alone wrongful conduct. Plaintiff appears to be seeking an inference the supervisor Defendants engaged in wrongful conduct based solely upon the evidence of the medical care he received at San Quentin. For the reasons discussed above, however, the evidence does not present a triable factual question on the issue of whether his care was medically unacceptable. If Plaintiff did not receive medically unacceptable care, the supervisor Defendants could not have been deliberately indifferent to his medical needs. Accordingly, there is no triable issue of fact that the supervisor Defendants Broomfield and Pachynski are liable for a violation of Plaintiff's Eighth Amendment rights. .

III.   Motion for Sanctions

Plaintiff moves for sanctions against Defendants' attorney under Rule 11 of the Federal Rules of Civil Procedure. (ECF No. 39.) Plaintiff claims Defendants' attorney made a false statement to the Court in the motion for an extension of time to file the motion for summary judgment that Plaintiff "did not have a problem with" the extension of time (ECF No. 39 at 1). Defendants' attorney did not make that statement; his declaration and the motion indicated Plaintiff did *not* agree to the extension. (ECF Nos. 18 at 2:22-23; 18-1 at 2:13.) Plaintiff's motion is DENIED.

//
//

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. Plaintiff's motion for sanctions is DENIED.

The clerk shall enter judgment and close the file.

This order resolves docket numbers 26 and 39.

**IT IS SO ORDERED.**

Dated: September 25, 2023

JACQUELINE SCOTT CORLEY
United States District Judge